UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOSEPH P. SHUMAKER**,                    Case Number 1:11 CV 2801

    Plaintiff,                                      Judge Sara Lioi

    v.                                             REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.                                     Magistrate Judge James R. Knepp II


### INTRODUCTION

Plaintiff Joseph P. Shumaker filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed in part and remanded in part.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB, alleging disability beginning November 25, 2006. (Tr. 121-23). Plaintiff alleges he is disabled due to coronary artery disease (CAD), hypertension, irritable bowel syndrome (IBS), posttraumatic stress disorder (PTSD), arthritis, and major depression. (Tr. 20, 39, 143). Plaintiff's claims were denied initially (Tr. 86) and upon reconsideration (Tr. 93). Plaintiff requested a hearing in front of an administrative law judge (ALJ). (Tr. 11). After a hearing, where Plaintiff (represented by counsel) and a vocational expert (VE) appeared, the ALJ denied Plaintiff's claims. (Tr. 15-27). The ALJ found Plaintiff had severe

impairments but was capable of performing a limited range of sedentary work. (Tr. 20, 26). On December 28, 2011, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

Plaintiff, a high school graduate and military veteran born in 1965, was 41 years old at the time of his alleged onset date and 45 years old at the time of the ALJ's decision. (Tr. 41). Plaintiff has past relevant experience working as a security technician, sales clerk, and electrician helper. (Tr. 73, 75). The record also reflects Plaintiff worked as a police officer, security guard, and private investigator periodically between 1994 and 2006. (Tr. 232). Plaintiff stated his job duties related to these positions were very demanding intellectually and physically, required him to carry a firearm, and placed him in danger on a consistent basis. (Tr. 232-235). In addition, the record reflects Plaintiff continued to work as a police officer up until August 2007, well after his alleged onset date. (Tr. 219). His duties included supervising police officers, answering police radio calls, and patrolling crowds. (Tr. 249).

### *Physical Medical History*

Plaintiff received care from the Veterans Affairs Medical Center (VAMC) or other Veterans Affairs sources beginning before his alleged onset date of November 25, 2006. (Tr. 488-502, 683-933, 937-1186, 1196-1284). Medical evidence predating Plaintiff's onset date is not irrelevant, but the Court may only consider evidence from those records in combination with evidence after the onset date to determine disability. *De Board v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006). Accordingly, the undersigned considers medical evidence predating the alleged onset date when it gives background or context to Plaintiff's conditions, but the evidence is not wholly incorporated herein.

2

In 2005, Plaintiff underwent two stent procedures to relieve symptoms related to CAD. (Tr. 928). In April 2006, Plaintiff received a pacemaker to ease symptoms related to CAD, but it was noted Plaintiff did not suffer from an enlarged heart or cardiopulmonary disease. (Tr. 329-30).

On July 11, 2006, Plaintiff called Dr. Lang at Streetsboro Family Practice and requested a handicap sticker due to "chronic fatigue". (Tr. 540). Plaintiff was informed to contact his cardiologist because he would need to be re-evaluated if his symptoms were severe enough to warrant a handicap sticker. (Tr. 540). However, Plaintiff's cardiologist refused to sign the handicap placard because Plaintiff was "doing well", and providing Plaintiff a handicap placard "would [amount to] fraud." (Tr. 540). On July 27, 2006, Plaintiff presented to Dr. Lang to discuss the handicap sticker denial. (Tr. 540). Dr. Lang noted Plaintiff was "very convoluted and a poor historian." (Tr. 540). Dr. Lang indicated she could not write a handicap card "simply because [Plaintiff] [felt] he should have one".  (Tr. 540).

In a letter dated July 31, 2006, Dr. Jason Smith of Akron Cardiology stated Plaintiff underwent several cardiovascular procedures, but opined his cardiac condition was stable and "[did] not limit [Plaintiff's] employment in any significant capacity", except that he cannot work in magnetic fields. (Tr. 599).

On September 1, 2006, Plaintiff presented to treating cardiologist Dr. William Bauman complaining of chest pain associated with a "clammy sensation" and feeling "wiped out". (Tr. 594). Plaintiff again presented with unchanged symptoms on September 5, 2006. (Tr. 595). Treatment notes indicate Plaintiff suffered from a history of cardiac disease and recurrent chest pain despite a normal EKG and stable hypertension. (Tr. 595). Cardiac rehabilitation was recommended. (Tr. 595). On September 12, 2006, Plaintiff returned to Dr. Bauman complaining of shortness of breath

3

and fatigue. (Tr. 542). Dr. Bauman changed Plaintiff's prescriptions and opined sleep apnea was the contributing factor to Plaintiff's symptoms. (Tr. 542). Despite shortness of breath, Plaintiff's heart rate and rhythm were normal. (Tr. 542). In a letter dated October 11, 2006, Dr. Bauman opined Plaintiff had "no significant obstructive disease" and his blood pressure was normal, despite ongoing complaints. (Tr. 589). Dr. Bauman opined Plaintiff was an excellent candidate for cardiac rehabilitation. (Tr. 589).

On October 19, 2006, treating physician Sudheera Kalepu, M.D. began treating Plaintiff for complaints associated with abdominal pain and depressive symptoms. (Tr. 924). Dr. Kalepu diagnosed Plaintiff with CAD, hypertension, Crohn's disease, anxiety, depression, and obesity, and requested Plaintiff follow-up with a cardiologist, gastroenterologist, and psychiatrist. (Tr. 926). A subsequent CAT scan of Plaintiff's abdomen revealed no acute abdominal/pelvic process but possible hypodensity in the left kidney. (Tr. 570).

On December 5, 2006, surgeon Richard Mason, D.O., noted Plaintiff had knee tenderness, chronic sprain of the right knee, and "probable old ALC and tears of the menisci." (Tr. 506). On December 11, 2006, Dr. Kalepu opined Plaintiff was medically stable to undergo arthroscopy to his right knee, and Plaintiff underwent bilateral arthoscopic knee surgery on December 21, 2006. (Tr. 490, 507). By December 29, 2006, Plaintiff was "doing well" with moderate pain, normal range of motion, and full strength in both knees. (Tr. 504). On January 15, 2007, Plaintiff reported his knees were a little worse, but he had "no specific complaints or concerns", and he was going to physical therapy. (Tr. 541).

On February 20, 2007, Edward Lesnefsky, M.D., evaluated Plaintiff. (Tr. 782-84). Dr. Lesnefsky noted Plaintiff's history of fatigue, chest pain, and subsequent diagnosis of CAD, which

required stents and pacemaker placement. (Tr. 783). Plaintiff reported fatigue, breathlessness, and chest discomfort, which became worse in cold weather. (Tr. 784). An examination revealed early systolic opening of the aortic valve and a minimal aortic murmur, but otherwise normal rhythm. (Tr. 784). Dr. Lesnefsky diagnosed Plaintiff with non-ischemic cardiomyopathy, CAD, and possible bicuspid aortic valve. (Tr. 784). Dr. Lesnefsky also noted Plaintiff was working as a security system consultant. (Tr. 784). A March 2007 stress test revealed no stress induced ischemia and normal left ventricular function. (Tr. 686).

On April 19, 2007, Dr. Kalepu noted Plaintiff's stress test was normal, and Plaintiff's CAD, hypertension, and depression were stable. (Tr. 766). Notably, after Plaintiff's two stent procedures and pacemaker placement, treatment notes consistently indicate Plaintiff's CAD and hypertension were stable. (Tr. 600, 867, 878, 885, 957-58, 983, 1043, 1066, 1125, 1149, 1182, 1209, 1230). Plaintiff complained of fatigue, but his CAD did not otherwise cause significant problems. (Id.). However, he did need cardiologic consulting, and some notes indicate diastolic dysfunction. (Tr. 867, 878, 957, 983, 1043, 1066, 1125, 1148, 1182).

On May 10, 2007, Plaintiff presented for a routine follow-up and requested Dr Kalepu write a letter to social security. (Tr. 757-60).  Plaintiff presented with no complaints, stated he was "feeling good", and reported he was walking his dog in the evenings, eating healthier, and exercising. (Tr. 760). Instead of writing a letter, Dr. Kalepu opined in treatment notes that Plaintiff had significant medical problems and he was unable to do any work both physically or mentally. (Tr. 756).

On January 7, 2008, Plaintiff presented to Dr. Kalepu for shortness of breath, but was stable during the visit, and was advised to see his cardiologist. (Tr. 955-57). On February 5, 2008, Plaintiff

5

presented complaining of fatigue. (Tr. 954). Treatment notes indicate Plaintiff suffered from probable sleep apnea. (Tr. 954). Plaintiff underwent a sleep study and was diagnosed with sleep apnea on April 23, 2008. (Tr. 1036).

In February, March, and April 2008, Plaintiff reported he was "feeling okay" with no complaints of chest pain or shortness of breath. (Tr. 947, 1043, 1060).

On June 18, 2008, Plaintiff presented to the gastroenterology clinic complaining of symptoms related to Crohn's disease. (Tr. 998). The attending physician opined Plaintiff's symptoms were not due to Crohn's or ulceritive colitis; rather, Plaintiff suffered from medication side effects or IBS. (Tr. 1001).

Although Plaintiff reported occasional chest pain on exertion, he reported no chest pain or shortness of breath during examinations at VAMC on September 10, 2008, November 3, 2008, January 27, 2009, March 30, 2009, and June 22, 2009. (Tr. 1124, 1148, 1181, 1208, 1229). On March 13, 2009 and March 30, 2009, Plaintiff presented for occasional chest pain but was stable both times. (Tr. 1208, 1213).

On July 30, 2009, Plaintiff presented to the VAMC orthopedic clinic with complaints of knee pain and was diagnosed with bilateral knee chondromalacia. (Tr. 1263).

***Mental Impairment Medical History***

Plaintiff was treated by various mental health professionals at VAMC for depression and PTSD between 2006 and 2009.

On October 25, 2006, Plaintiff began treatment with treating psychiatrist Dr. Ana Martinez. Plaintiff saw Dr. Martinez for psychiatric treatment approximately twenty times between October 2006 and June 2009. Dr. Martinez's treatment notes vary to some degree, but generally indicate

similar complaints and clinical findings.  (Tr. 445-447, 489-94, 681-83, 715-17, 735-37, 761-63, 770-74, 789-92, 805, 966-73, 1030, 1055-59, 1174-83, 1202-04, 1280-84). For instance, Dr. Martinez consistently diagnosed Plaintiff with major depression and PTSD with Global Assessment of Functioning ("GAF") scores ranging between 40 and 50. GAF scores in this range indicate serious symptoms and serious impairments in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. Text Rev., p. 34 (2005) (commonly referred to as "DSM-IV-TR"). Plaintiff frequently reported feeling sad, depressed, and irritable, with low energy, no motivation, anxiety, poor memory, and poor appetite. (Tr. 445-447, 489-94, 681-83, 715-17, 735-37, 761-63, 770-74, 789-92, 805, 966-73, 1030, 1055-59, 1174-83, 1202-04, 1280-84). On one occasion, Plaintiff reported suicidal thoughts, but stated he would not go through with it because of his children. (Tr. 772). Dr. Martinez's treatment notes also frequently indicate Plaintiff was alert, oriented, coherent, goal-directed, polite, cooperative, well-groomed, with good insight and judgment, no delusions or hallucinations, and strong, supportive family values. (Tr. 445-447, 489-94, 681-83, 715-17, 735-37, 761-63, 770-74, 789-92, 805, 966-73, 1030, 1055-59, 1174-83, 1202-04, 1280-84). Dr. Martinez managed Plaintiff's depression with medication. (Tr. 805). At the last few appointments on record with Dr. Martinez, Plaintiff reported he was "doing OK" (Tr. 1130), and despite complaints of being "in a rut", Plaintiff reported he works outside on his house, goes fishing or plays video games with his son, and walks his dog. (Tr. 1284). In addition, throughout the relevant time period, Plaintiff discussed his marriage, subsequent divorce, and a developing relationship. (Tr. 967-970, 1055). At the time of the ALJ hearing, Plaintiff was engaged to be married. (Tr. 41).

Plaintiff also went to Matthew Carlton, licensed clinical social worker, and Lauren Mullen,

clinical nurse specialist. (Tr. 730-34, 769-71, 844-48, 973, 966-67). Plaintiff generally presented in a dull mood, but was alert, oriented, coherent, cooperative, polite, and well-groomed, with good judgment and insight. (Tr. 730-34, 769-71). On occasion, Plaintiff complained of nightmares, but also reported his medication was effective. (Tr. 730, 967).

In May 2008, Plaintiff began treatment with Monica Reider, a readjustment therapist. (Tr. 1028). Throughout the remainder of 2008 and 2009, Plaintiff attended individual and group therapy sessions with Ms. Reider to manage symptoms related to his depression and PTSD. (Tr. 1027-43, 1181-84, 1258-77, 1280-82). Plaintiff participated fully in each group, was oriented, alert, had an even mood, and did not endorse suicidal ideations or psychiatric distress. (Tr. 1027-43, 1181-84, 1258-77, 1280-82). On one occasion, Plaintiff reported to Ms. Reider he had planned to kill himself, but did not go through with it, and said he would call a friend if he became suicidal. (Tr. 1028). Plaintiff told Dr. Martinez group therapy was helping. (Tr. 1130, 1174).

Occasionally, VAMC mental health professionals participated in a collaborative psychiatric interdisciplinary review of Plaintiff. (Tr. 726-29, 1047-52). All VAMC mental health professionals treating Plaintiff, including Dr. Martinez, acknowledged the reviews. On March 22, 2007 and April 4, 2008, the VAMC team noted Plaintiff required no restrictions, was insightful, had supportive friends and family, was utilizing effective coping skills, and was clinically stable. (Tr. 726-29, 1047-52). Indeed, during the relevant time, VAMC professionals consistently noted Plaintiff's depression was stable. (Tr. 541, 721, 748, 759, 766, 846, 867, 878, 885, 958, 983, 1043, 1066, 1125, 1149, 1160, 1182, 1209, 1230, 1274). And while Plaintiff reported auditory hallucinations on a few occasions (Tr. 725, 790), the majority of his mental health exams denied hallucinations (Tr. 446, 462, 498, 682, 717, 724, 730, 737, 762, 773, 791, 807, 810, 849, 856, 881, 892, 906-907, 917, 949,

8

967, 971-73, 985, 1028, 1056, 1130, 1138, 1142, 1176, 1186, 1212, 1222-23, 1239-40).

***Opinion Evidence***

On March 7, 2007, E.M. Bard, Ph.D., independently evaluated Plaintiff at the request of the Social Security Administration (SSA). (Tr. 649). Concerning daily activity, Plaintiff reported he was able to prepare simple foods, perform household chores, and manage his own funds. (Tr. 653). Plaintiff reported he frequently drives, washes the car, walks the family dog, uses his computer, and reads self-help books. (Tr. 653). Dr. Bard concluded Plaintiff only had mild limitations in his ability to relate to others; no limitations in his ability to understand and follow directions; no limitations in his ability to maintain attention to perform simple, repetitive tasks; and moderate limitations to withstand stress and pressures associated with day-to-day work activities. (Tr. 653). After diagnosing Plaintiff with depressive disorder and anxiety, Dr. Bard found Plaintiff's GAF score was 63, noting Plaintiff was in a mild symptom classification range. (Tr. 653).

On April 6, 2007, Karla Voyten, Ph.D., a state agency physician, evaluated Plaintiff's mental condition after reviewing Plaintiff's records. (Tr. 655). Dr. Voyten found "[n]o evidence of limitation" in Plaintiff's understanding, memory, and sustaining concentration and persistence. (Tr. 655). However, Plaintiff was moderately limited in his ability to complete a normal work-day and workweek without interruption from psychologically based symptoms. (Tr. 656). Dr. Voyten concluded Plaintiff had mild symptoms of depression and anxiety, but Plaintiff could understand, remember, and carry out simple and complex instructions, work without social restriction, and work in an environment without strict production quotas or frequent workplace changes. (Tr. 657). On August 13, 2007, Bruce Goldsmith, Ph.D., a state disability physician, affirmed Dr. Voyten's

opinion. (Tr. 935). On February 25, 2009, Joan Williams, Ph.D., a state agency physician, reviewed Plaintiff's mental health medical evidence, affirmed Dr. Voyten's assessment, and found Dr. Martinez's findings of marked deficiencies inconsistent with the record. (Tr. 1187). Dr. Williams noted Plaintiff's VA psychological and pension exams "did not describe observations [or] signs of a high degree of mental functional deficiency." (Tr. 1087).

On April 14, 2007, Elizabeth Das, M.D., a state agency physician, evaluated Plaintiff's physical condition after reviewing the medical evidence. (Tr. 673-80). Dr. Das found Plaintiff could perform light exertional work, and noted Plaintiff's allegations of disability were inconsistent with the medical records. (Tr. 678). Dr. Das found Plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently. (Tr. 674). She found Plaintiff was occasionally limited in postural activities, and he could never climb ladders, ropes, or scaffolding, but could walk, stand, or sit for six hours in a work day. (Tr. 674-75, 677). Dr. Das also found Plaintiff could not be exposed to concentrated, extreme heat. (Tr. 674-75, 677). On August 13 2007, Charles Arrow, M.D., a state agency physician, affirmed Dr. Das's opinion. (Tr. 936).

On July 13, 2007, Dr. Martinez completed a Psychiatric/Psychological Impairment Questionnaire. (Tr. 812-19). Dr. Martinez reported Plaintiff's GAF score was 40-45, his prognosis was guarded, and his most severe symptom was a depressed mood. Dr. Martinez opined Plaintiff was markedly or moderately limited in all functional areas of understanding and memory and sustaining concentration and pace, except his ability to make simple work-related decisions, which she found only mildly limited. She opined Plaintiff suffered from poor memory, mood disturbance, decreased energy, pervasive loss of interest, and social withdrawal or isolation. (Tr. 813).

On September 30, 2008, Dr. Martinez issued a similar opinion. (Tr. 1086-93). She noted

10

Plaintiff was overwhelmed, unable to organize his life, and needed assistance to pay bills. (Tr. 1088). Plaintiff was markedly limited in his ability to remember locations, work-like procedures, and detailed instructions, but only moderately limited in his ability to understand and remember one or two step instructions. (Tr. 1089). Dr. Martinez noted Plaintiff was incapable of even low stress work, and Plaintiff's GAF score was 50. (Tr. 1092-93).

On July 1, 2008, Dr. Kalepu completed a Multiple Impairment Questionnaire. (Tr. 1072-79). Dr. Kalepu noted Plaintiff's diagnoses of CAD, hypertension, inflammatory bowel disease, GED, arthritis, and hyperlipidemia, but opined Plaintiff's prognosis was "fair to good". (Tr. 1072). Plaintiff's primary symptoms were fatigue, occasional chest pain, and acid reflux. (Tr. 1073). Dr. Kalepu noted Plaintiff's chest pain occurred a few times a week, after eating or exertion, and the estimated range of pain was one on a ten point scale, but fatigue was an eight. (Tr. 1074). It was further noted Plaintiff's pain was relieved with medication. (Tr. 1074). Dr. Kalepu opined Plaintiff could only sit for two hours and stand for one hour in an eight hour work-day  (Tr. 1074), and Plaintiff's symptoms would increase if placed in a competitive work environment to an unspecified degree. (Tr. 1076). Dr. Kalepu failed to answer whether Plaintiff was capable of full-time competitive work. (Tr. 1077).  When asked if it would be necessary or medically recommended for Plaintiff  not to stand or walk for continuous periods in a work setting, Dr. Kalepu said no. (Tr. 1075). She noted Plaintiff could frequently lift and carry up to ten pounds, occasionally twenty, and Plaintiff was capable of low stress work, but would need breaks every few hours, would be absent more than three times a month, and symptoms would frequently interfere with Plaintiff's attention and concentration. (Tr. 1075, 1077). Dr. Kalepu pointed out Plaintiff's limitations related to the questionnaire began in July 2008, nearly two years after Plaintiff's alleged onset date. (Tr. 1078).

Indiresha Ramachandra, M.D., a VAMC physician, co-signed a Cardiac Impairment Questionnaire completed by nurse practitioner Stephen Rusterholtz on July 8, 2008. (Tr. 1095-1100). Nurse Rusterholtz noted Plaintiff's CAD was not significant, and Plaintiff had a two percent, low to intermediate risk of having complications within ten years. (Tr. 1095). He noted Plaintiff's non-cardiac chest pain and palpitations, but opined Plaintiff's CAD was non-obstructive. (Tr. 1096). Nurse Rusterholtz opined Plaintiff could perform low stress work, but Plaintiff's symptoms would exacerbate in hot weather. (Tr. 1097- 98). He limited Plaintiff to sitting for two hours and standing or walking for one hour in an eight hour work day; lifting or carrying twenty pounds occasionally and ten pounds frequently, with periodic pain and work absences more than three times a month. (Tr. 1097-98). Nurse Rusterholtz noted Plaintiff's symptoms were likely caused by a combination of sleep apnea and deconditioning, rather than cardiac conditions. (Tr. 1099).

On March 19, 2009, Walter Holbrook, M.D., a state agency physician, reviewed Plaintiff's medical evidence and concluded Plaintiff could lift or carry twenty pounds occasionally, ten pounds frequently; walk or stand for two hours and sit for six hours in a workday. He also found Plaintiff could occasionally stoop, kneel, crouch or crawl, but never climb ladders, ropes, or scaffolds. (Tr. 1190). Dr. Holbrook concluded Plaintiff should avoid concentrated exposure to extreme heat and cold, and fumes, odors, gases, and areas with poor ventilation. (Tr. 1192).

***Vocational Analysis***

On April 7, 2009, the SSA assessed Plaintiff's vocational capacity and concluded Plaintiff had a residual functional capacity (RFC) for sedentary work. (Tr. 236). Specifically, Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for three to four hours and sit for about six hours out of an eight hour work day; overhead work was limited,

12

and Plaintiff could not work in extreme hot or cold temperatures. (Tr. 236). Plaintiff could work without social restriction, but in environments without strict time or production quotas. (Tr. 236). Ms. Crossin, DPS, concluded Plaintiff could not perform prior work, but could perform a full range of sedentary work. (Tr. 237).

### Department of Veterans Affairs

The record includes three decisions from the Department of Veteran's Affairs (VA) finding Plaintiff disabled to some extent under VA regulations. (Tr. 135-38, 181-85, 215-19).

On October 21, 2005, the VA issued a decision finding Plaintiff had a ten percent military service connected disability due to cardiomyopathy and depression. (Tr. 135). Plaintiff's physical VA examination revealed a normal stress test, normal chest x-rays, and a normal electrocardiogram. (Tr. 136). The VA opined Plaintiff's stent procedures and medication controlled his cardiomyopathy and CAD. (Tr. 136). Plaintiff's mental VA examination revealed Plaintiff was articulate and forthcoming, intelligent, and cooperative, with memory intact and no evidence of thought disorder. (Tr. 136). Further, Plaintiff denied symptoms of panic, but admitted feeling stressed and anxious on occasion. (Tr. 136). The VA concluded Plaintiff's worries and anxiety were specifically related to limitations caused by his heart condition as opposed to prior military service. (Tr. 137).

On April 24, 2007, the VA found Plaintiff's ten percent disability due to cardiomyopathy should be increased to 100 percent between April 26, 2006 and July 1, 2006 to accommodate Plaintiff's recovery from having a stent implanted. (Tr. 182). On July 2, 2006, Plaintiff's VA disability was decreased to 60 percent. (Tr. 183). Plaintiff's depression was not addressed. The VA noted Plaintiff's cardiomyopathy "does not present such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of

13

hospitalization". (Tr. 184). The VA denied Plaintiff's claims for disability due to hypertension and chronic fatigue. (Tr. 184-85).

On July 24, 2008, the VA notified Plaintiff of his 90 percent military connected disability due to cardiomyopathy. (Tr. 216). The notice states that a rating decision was enclosed; however, it is not in the record. (Tr. 217).

### *ALJ Hearing*

On September 2, 2009, Plaintiff testified his "fiance/girlfriend" and her daughter lived with him, and his son visited every weekend and lived with him during the summer. (Tr. 41). Plaintiff testified he could not keep up with his work duties because of his heart condition, was fired, and began receiving VA disability. (Tr. 47-48). After his pacemaker was implanted, Plaintiff testified he has a harder time climbing stairs, gets winded easily, still suffers from chest pain four to five times per week, and has a hard time bending and lifting things without feeling dizzy. (Tr. 54, 67-68). Plaintiff testified he performs no chores around the house and his fiancé does everything. (Tr. 54). Plaintiff spends his days going to group therapy, individual therapy, and psychiatric appointments. (Tr. 55).  Plaintiff also researches and emails on his computer, goes to the store, and talks to salespeople, but prefers being alone and avoids big crowds. (Tr. 56-57). However, he later testified he took his children to a water park, sometimes goes out to eat, and even went to a fair, but left due to the large crowd. (Tr. 57, 61). Plaintiff plays video games or watches movies with his son, but often sleeps during the day because of difficulty sleeping at night. (Tr. 58, 64). He used to enjoy fishing, hunting, and motor cross, but testified he can longer partake in those activities due to his conditions. (Tr. 55).

*ALJ Decision*

The ALJ found Plaintiff had the following severe impairments: "CAD with myocardial ischemia and arrythmia and a bicuspid aortic valve, obesity, obstructive sleep apnea, major depressive order and PTSD, [IBS], and arthritis." (Tr. 20). The ALJ found these impairments individually, or in combination, do not medically meet or equal a listing impairment. (Tr. 20-21). After reviewing the record, the ALJ concluded Plaintiff had the RFC to:

> [L]ift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk 2 hours of an 8 hour day. He can sit for at least 6 hours of an 8 hour day. He can occasionally climb, but no ladders, ropes or scaffolds. He can occasionally stoop, kneel, crouch and crawl. He must avoid work environments of extreme cold and heat. He needs to avoid smoke[], fumes, dusts, and gases[,] and avoid hazards such as dangerous machinery and unprotected heights. He is limited to performing simple[,] repetitive tasks but not in a fast-paced production environment such as an assembly line. He can only deal with the public on a superficial basis.

(Tr. 22). The ALJ determined Plaintiff's allegations of intensity, duration, and limiting affects were not credible to the extent they were not consistent with the evidence in the record or the RFC determined by the ALJ. (Tr. 23).

After review of record evidence and VE testimony, the ALJ concluded Plaintiff could not perform his past work as a security technician or retail sales clerk. However, the ALJ did find Plaintiff could perform other work available in the national economy, including film inspector, electronic inspector, and system monitor according to the Dictionary of Occupational Titles (DOT).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

15

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity,

16

age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff alleges the ALJ erred in three ways: first, by not giving controlling weight to Plaintiff's treating physicians, Drs. Kalepu and Martinez; second, by failing to consider the VA disability determinations; and third, by failing to properly evaluate Plaintiff's credibility. (Doc. 12, at 14, 17-18). Plaintiff's allegations are not well-taken, save one: The ALJ erred by not considering the VA disability determinations.

### *Treating Physician Rule*

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating

17

physicians." *Rogers*, 486 F.3d at 242. A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2)[1]. In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ"s reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F. 3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows her physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the

---

1. 20 C.F.R. § 404.1527(d)– the regulation section defining the treating physician rule – was recently renumbered to § 404.1527(c) due to revisions not affecting the provision or rule. 77 FR 10650, at * 10656 (Feb. 23, 2012). Plaintiff and Defendant cite § 404.1527(d) to explain the rule but the undersigned will cite the current and correct citation throughout this recommendation.

agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

In his opinion, the ALJ explicitly rejected Dr. Martinez's opinion and gave less weight to Dr. Kalepu's opinion:

> Dr. Kalepu's opinion . . . was considered; however, [Plaintiff's] impairments do not logically impose limitations on sitting. Therefore, that opinion is given less weight. As discussed above, Dr. Martinez's opinion is not given any weight as it is not consistent with the record; the medical evidence of the record supports that the [Plaintiff] could perform simple tasks and does not need assistance with any of his activities.

(Tr. 25).

Plaintiff argues the ALJ failed to weigh the factors in 20 C.F.R. 404.1527(c)(2)-(6) when giving Drs. Kalepu and Martinez less than controlling weight. This is simply not the case. The ALJ specifically relied on two factors in giving the treating opinions less than controlling weight: lack of record support and inconsistency with the record. 20 C.F.R. 404.1527(c)(3)-(4).

First, the ALJ pointed to evidence contradicting Dr. Martinez's restrictive opinion that Plaintiff was unable to perform simple tasks, such as Plaintiff's ability to care for his son, remembering to take medication, regularly attending appointments, and not requiring help or supervision to complete daily activities. (Tr. 24-25). The ALJ also cited examples of Plaintiff's ability to read, use the computer to research issues, drive on a consistent basis, walk his dog, shop, handle his own finances, and prepare simple meals. (Tr. 20, 24). The ALJ acknowledged Plaintiff maintained good familial relationships and Plaintiff was generally described as alert, oriented, logical, and coherent. (Tr. 20, 24). The ALJ noted Plaintiff attended group therapy, but did not like large crowds, and spent his time reading, watching television, or using his computer. (Tr. 25).

19

Further, the ALJ cited findings by Drs. Bard and Williams, which noted Plaintiff's mild to moderate functional limitations and specific rejection of Dr. Martinez's restrictive opinion. (Tr. 25). Therefore, the ALJ gave sufficient and specific regulatory reasons for rejecting Dr. Martinez's opinion; namely, inconsistency and lack of record support.

Moreover, the ALJ's decision is supported by substantial evidence. Treatment notes consistently indicate Plaintiff's depression was stable  (Tr. 541, 721, 748, 759, 766, 846, 867, 878, 885, 958, 983, 1043, 1066, 1125, 1149, 1160, 1182, 1209, 1230, 1274), he was cooperative and polite, alert and oriented, coherent, logical, had good insight and judgment, and did not have hallucinations or suicidal ideations, (Tr. 445-447, 489-94, 681-83, 715-17, 735-37, 761-63, 770-74, 789-92, 805, 966-73, 1030, 1055-59, 1174-83, 1202-04, 1280-84), he regularly attended and fully participated in group and individual therapy (Tr. 1027-43, 1181-84, 1258-77, 1280-82), and Plaintiff told Dr. Martinez group therapy was helping. (Tr. 1130, 1174).

On two occasions, Dr. Martinez acknowledged a collaborative VAMC  psychiatric interdisciplinary review of Plaintiff. (Tr. 726-29, 1047-52).  Both reviews noted Plaintiff required no restrictions, posed no imminent risk to himself or others, was insightful, had supportive friends and family, was utilizing effective coping skills, and was clinically stable. (Tr. 726-29, 1047-52). Plaintiff's noted objective was to learn self-care for depression, such as exercise, nutrition, awareness, and attitude. (Tr. 728).

Plaintiff asserts "all of the treating sources at VAMC found [Plaintiff] could not perform any work." (Doc. 12, at 15). However, contrary to Plaintiff's assertion, Dr. Kalepu and Nurse Rusterholtz indicated he was capable of low stress work. (Tr. 1076, 1098). Moreover, at Plaintiff's most recent appointments with Dr. Martinez, despite a dull mood, Plaintiff reported he was "doing OK" (Tr. 1130), had been working outside on his house, fishing, walking his dog, and playing video

games with his son. (Tr. 1284). The ALJ provided good reasons for rejecting Dr. Martinez's opinion and record evidence supports his decision.

Second, the ALJ did not reject all of Dr. Kalepu's opinion; rather, he rejected only the portion limiting Plaintiff to sitting less than 6 hours per workday. (Tr. 25, 1074). In fact, the ALJ essentially agreed with Dr. Kalepu's assessment of Plaintiff. For example, the ALJ agreed with Dr. Kalepu's opinion that Plaintiff could lift up to twenty pounds frequently and ten pounds occasionally, and could stand or walk for less than two hours during an eight hour workday. (Tr. 22, 1074-75).

The ALJ disagreed with Dr. Kalepu's sitting limitation, and as the ALJ explained, the record does not support the sitting limitation. The ALJ acknowledged Dr. Kalepu's restriction, but noted Dr. Kalepu opined Plaintiff's prognosis was "fair to good". (Tr. 23). The ALJ pointed to treatment notes indicating Plaintiff felt fine, and had no physical complaints. (Tr. 23). The ALJ also pointed to Dr. Holbrook's opinion contradicting Dr. Kalepu's sitting restrictions. (Tr. 1188-95). In sum, the ALJ provided good reasons for partially rejecting Dr. Kalepu's opinion and did so by relaying its inconsistency with the record.

In addition, substantial evidence supports the ALJ's decision to reject Dr. Kalepu's sitting limitation. Dr. Kalepu noted Plaintiff was capable of low stress work and opined it was not medically necessary to preclude Plaintiff from sitting continuously in a work setting. (Tr. 1074). Dr. Smith noted Plaintiff's cardiac condition was stable and opined Plaintiff was not limited in any significant capacity. (Tr. 599). Dr. Bauman, Plaintiff's treating cardiologist, indicated Plaintiff had no obstructive disease and recommended cardiac rehabilitation. (Tr. 589). Notably, treatment notes consistently indicate Plaintiff's CAD and hypertension were stable. (Tr. 600, 867, 878, 885, 957-58, 983, 1043, 1066, 1125, 1149, 1182, 1209, 1230).

21

Plaintiff also argues, in a footnote, the ALJ erred because no weight was given to the opinion of Nurse Rusterholtz, which was co-signed by Dr. Ramachandra. However, Plaintiff is incorrect. Under the regulations, a "treating source" includes physicians, psychologists, or other "acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. A medical provider is not considered a treating source if the claimant's relationship with them is based solely on the need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502.

The only reference to Dr. Ramachandra in the record is her signature on a questionnaire completed by Nurse Rusterholtz. There are no treatment records from Dr. Ramachandra, nor is there evidence of a patient physician relationship. The questionnaire was provided solely for the purpose of obtaining a report in support of Plaintiff's claim for disability. This is evidenced by the form, provided by Plaintiff's counsel, requesting Nurse Rusterholtz to provide information not "previously provided to the [SSA] or to [Plaintiff's counsel]." Plaintiff's counsel then sent this questionnaire to the SSA "to assist [the SSA] in rendering a decision" regarding Plaintiff's disability. (Tr. 1094).

In addition, a treating source under 20 C.F.R. § 404.1527(c)(2) must be a "treating source" or an "acceptable medical source", and a nurse practitioner is not. 20 C.F.R. §§ 404.1502, 404.1513(a), 404.1513(d)(1). Rather, as a nurse practitioner, Nurse Rusterholtz is an "other" medical source. 20 C.F.R. § 404.1513(d)(1). In SSR 06-3p, the SSA explained that "acceptable medical sources" are the only sources considered treating sources as defined in 20 C.F.R. § 1502, and therefore the only medical opinions entitled to controlling weight. *See* SSR 06-3p; 404.1527(c); *Mulky v. Comm'r of Soc. Sec.*, 2011 WL 4528485, at *6 (W.D. Mich. 2011). Because Nurse Rusterholz is not an acceptable medical source, the ALJ was not required to provide good reasons for the weight given to his opinion under 4074.1527(c)(2). *See Mulky v. Comm'r of Soc. Sec.*, 2011

22

WL 4528485, at *6.

Accordingly, the ALJ did not err in evaluating the weight given to Plaintiff's treating physicians or other medical sources, nor did he fail to weigh his decision according to regulatory factors.

***VA Disability Determinations***

Because VA standards differ from the standards employed by the SSA, VA decisions are not binding on the determination of whether an individual is disabled for purposes of social security disability. 20 C.F.R. § 404.1504; *See also* SSR 06-03p, 2006 WL 2329939, at *6. Federal regulations pertaining to the SSA provide:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled [] is based upon its rules and is not our decision about whether you are disabled []. We must make a disability [] determination based on social security law. Therefore, a determination made by another agency that you are disabled [] is not binding on us.

20 C.F.R. § 404.1504. However, while not binding, the Sixth Circuit has observed that disability decisions of other governmental agencies must be taken into account. *Harris v. Heckler*, 756 F.2d 431, 434 (6th Cir. 1985) (reversing SSA denial of benefits, noting it was "strange" the ALJ had the "audacity" to find the claimant not disabled for purposes of social security benefits after he was already found disabled for the purposes of Black Lung and Workers' Compensation benefits); *Stewart v. Heckler*, 730 F.2d 1065, 1068 (the court reversed, mentioning that the VA found claimant totally disabled); *see also King v. Comm'r of Soc. Sec.*, 779 F.Supp.2d 721, 725 (E.D. Mich 2011). Indeed, even the SSA provides that VA decisions "cannot be ignored and must be considered." SSR 06-03p, 2006 WL 2329939. The Sixth Circuit, however, has not determined the amount of weight the Commissioner must give to VA disability determinations. *King*, 779 F.Supp.2d at 725.

Many other circuits have required the Commissioner to at least discuss and give reasons for

23

discounting VA disability determinations. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir.

2001) (per curiam) (VA disability rating generally is entitled to "great weight" and "must be

considered by the ALJ"); *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998) (holding "findings

of disability by other federal agencies . . . are entitled to some weight and must be considered in the

ALJ's decision"); *Baca v. Dep't of Health and Human Servs.*, 5 F.3d 476, 480 (10th Cir. 1993)

("Although findings by other agencies are not binding on the Secretary, they are entitled to weight

and must be considered.") (quoting *Fowler v. Califano*, 596 F.2d 600, 603 (3rd Cir. 1979)); *Davel*

*v. Sullivan*, 902 F2d 559, 560 n.1 (7th Cir. 1990) (noting the VA's decision is "entitled to some

weight" and should be considered by the ALJ); *Kane v. Heckler*, 776 F.2d 1130, 1135 (3rd Cir.

1985) (asserting the VA determination is entitled to "substantial weight"); *Brady v. Heckler*, 724

F.2d 914, 921 (11th Cir. 1984) (per curiam) (noting the VA rating is entitled to "great weight")

*DeLaotche v. Heckler*, 715 F.2d 148, 150 n.1 (4th Cir. 1983) (same) (quoting *King*, 779 F.Supp.2d

at 725 (quotations omitted)).

Several courts within the Sixth Circuit have required the ALJ to assign "some weight to the

VA's decision and articulate his or her reasons for finding such." *Briskey v. Astrue*, 2011 WL

672553, at *4 (N.D. Ohio 2011); *see also Rothgeb v.* Astrue, 626 F.Supp.2d 797, 810 (S.D. Ohio

2009); *Daniels v. Comm'r of Soc. Sec.*, 2008 WL 4394356, at *5 (W.D. Mich. 2008); *Partin v.*

*Comm'r of Soc. Sec.*, 2010 WL 3779304, at *2 (W.D. Mich. 2010); *Gibson v. Astrue*, 2010 WL

148807, at *5 (E.D. Ky. 2010); *Proctor v. Comm'r of Soc. Sec.*, 2010 WL 4026083, at *9 (S.D. Ohio

2010). Importantly, a district court within the Sixth Circuit adopted and articulated the evidentiary

approach ALJ's should follow, consistent with the cases detailed directly above:

> [T]he relative weight to be given [to VA] evidence will vary depending upon the
> factual circumstances in each case. Since the regulations for disability status differ
> between the SSA and the VA, ALJ's need not give "great weight" to a VA disability

determination if they adequately explain the valid reasons for not doing so.

*King*, 779 F.Supp.2d at 726 (citing *Chambliss*, 269 F.3d at 522).

As the *King* court explained, this reasoning "closely approximates the Sixth Circuit's general rule as to the manner ALJ's must consider the evidence presented to them." *King*, 779 F.Supp.2d at 726; *see Hurst v. Sec'y of Health and Human Servs*., 753 F.2d 517, 519 (6th Cir. 1985) ("It is more than merely helpful for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely meaningful for appellate review."). While the undersigned agrees with this evidentiary approach, Defendant's argument must be addressed before suggesting remand.

Defendant argues *Briskey v. Astrue*, 2011 WL 672553 (N.D. Ohio 2011) "left open room for an argument that [] an omission [of VA determinations] could be harmless [when] the ALJ explains his rejection of disability based on each relevant impairment." (Doc. 13, at 19-20). Thus, Defendant argues the ALJ's failure to mention the VA determinations was harmless because he considered the impairments analyzed in the VA determinations. However, this argument is not persuasive. After finding the ALJ erred for failing to account for impairments considered by the VA, the *Briskey* court specifically noted "ALJ Cicollini's recitation of the record evidence [] did not obviate his duty to articulate the weight and supporting reasoning for his decision to reject the VA's determination." 2011 WL 672553, at *5. The undersigned cannot reconcile articulating a harmless error rule when its basis was abrogated in the next breath.

In Plaintiff's case, the ALJ did not mention the VA determinations at all. The ALJ's failure to acknowledge the VA determinations is not harmless, and even if his ultimate decision does not change, the ALJ must articulate why. Accordingly, the undersigned recommends remanding to the Commissioner so he may explain what  weight, if any, he assigned to the VA's decisions, and articulate his reasoning regarding the same.

25

*Credibility*

A claimant's subjective complaints can support a claim for disability, but there must also be objective medical evidence in the record of an underlying medical condition. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). On review, the Court is to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Id.* (citation omitted). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *2. In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms (especially pain) are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

(I) [A claimant's] daily activities;

26

(ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;
(vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).

Plaintiff argues the ALJ erred because he only considered Plaintiff's daily activities when assessing Plaintiff's credibility, but this is not the case. The ALJ noted Plaintiff's impairments could reasonably be expected to cause the symptoms alleged, but Plaintiff's statements concerning the intensity, persistence, and limiting effects were not credible to the extent they are inconsistent with the RFC. (Tr. 23). In rendering his credibility opinion, the ALJ cited the proper regulatory authority and noted Plaintiff's alleged symptoms conflicted with Plaintiff's daily activities and the medical record. (Tr. 20-23). 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186. Indeed, the ALJ spent over three pages discussing medical evidence contradicting Plaintiff's subjective complaints. (Tr. 23-25). In addition, the record shows Plaintiff was capable of low stress work (Tr. 23, 1072, 1078, 1098); Plaintiff required no restrictions, was insightful, had supportive friends and family, was utilizing effective coping skills, and was clinically stable (Tr. 726-29, 1047-52); Plaintiff's depression was stable (Tr. 541, 721, 748, 759, 766, 846, 867, 878, 885, 958, 983, 1043, 1066, 1125, 1149, 1160, 1182, 1209, 1230, 1274); and the majority of Plaintiff's mental health exams denied hallucinations

27

(Tr. 446, 462, 498, 682, 717, 724, 730, 737, 762, 773, 791, 807,810, 849, 856, 881, 892, 906-907, 917, 949, 967, 971-73, 985, 1028, 1056, 1130, 1138, 1142, 1176, 1186, 1212, 1222-23, 1239-40). It was consistently noted Plaintiff was cooperative and polite, coherent, logical, and goal directed, and had good or adequate insight or judgment (Tr. 445-447, 489-94, 681-83, 715-17, 735-37, 761-63, 770-74, 789-92, 805, 966-73, 1030, 1055-59, 1174-83, 1202-04, 1280-84); Plaintiff regularly attended and fully participated in group and individual therapy (Tr. 1027-43, 1181-84, 1258-77, 1280-82); and Plaintiff's CAD and hypertension were stable (595, 589, 599, 600, 686, 766, 867, 878, 957-58, 983, 1043, 1066, 1125, 1149, 1182, 1209, 1230).

Remanding based on the ALJ's failure to explain reasons for not giving weight to VA determinations does not disrupt the ALJ's credibility determination. The standard for evaluating credibility is whether the ALJ's reasoning is supported by substantial evidence in the record, not whether the ALJ failed to discuss reasons for discounting VA determinations. *Jones*, 336 F.3d at 476; *see also King*, 779 F.Supp.2d at 723, 725. Accordingly, the ALJ's explanations for discrediting Plaintiff are reasonable and supported by substantial evidence in the record.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, this Court finds substantial evidence does not support the Commissioner's decision denying DIB benefits only to the extent that the ALJ failed to discuss what impact, if any, Plaintiff's VA disability determinations had on the ALJ's decision. The undersigned therefore recommends the Commissioner's decision be reversed and remanded, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this recommendation.

    s/James R. Knepp, II
United States Magistrate Judge

28

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).